**REVLON CONSUMER PRODUCTS CORPORATION, Plaintiff,**

v.

**JENNIFER LEATHER BROADWAY, INC., Defendant.**

**No. 94 Civ. 0367 (MGC).**

United States District Court, S.D. New York.

Aug. 5, 1994.

Stroock & Stroock & Lavan by William A. Rome, Mark Kesslen, New York City, for plaintiff.

Law Offices of Bernard Wincig by Owen Wincig, New York City, for defendant.

## OPINION

CEDARBAUM, District Judge.

Plaintiff Revlon Consumer Products Corporation ("Revlon") sells cosmetics and other beauty products. Defendant Jennifer Leather Broadway, Inc. ("Jennifer Leather") sells leather furniture. Revlon seeks to enjoin Jennifer Leather from publishing advertisements for its couches that state, "only Revlon has more colors." Revlon sues Jennifer Leather under the Lanham Act, the New York General Business Law, and the common law.

After expedited discovery, trial on the merits was consolidated with a hearing on plaintiff's application for a preliminary in-

junction, in accordance with Fed.R.Civ.P. 65(a)(2). A three-day bench trial was held.

*Facts*

### A. *Revlon*

Revlon is a leading manufacturer of women's cosmetics and assorted health and beauty supplies. It has used the name Revlon since 1932 and the name is a registered trademark for a wide variety of cosmetics and personal care products.[1] Revlon is not registered as a trademark for furniture, or any other durable good or large household item. Revlon has never manufactured, distributed, or even licensed the use of its name for the marketing of such products.

One of Revlon's major businesses is "color cosmetics," which include "such products as lipstick, face cosmetics, eye cosmetics such as mascaras and eyeliners, [and] nail cosmetics such as nail enamel." (Tr. 12). Revlon sells its cosmetics in a wide variety of colors and has often advertised its selection of shades. Revlon's senior vice president and general counsel, Wade Nichols, testified that it is plaintiff's position that it offers more colors than any other cosmetics manufacturer. (Tr. 37–38, 49–50).

Robert Grant, Revlon's vice president for marketing research, testified that plaintiff attempts to "position" its cosmetics as "a high quality product that offers a wide range of shades at an affordable price." (Tr. 139). Through its advertising, Grant testified, Revlon attempts to project an image of "glamour, glitz, pizzazz, fashion, sophistication." (Tr. 141). Similarly, Nichols described the image Revlon attempts to project as "youthful, fun, ego-enhancing." (Tr. 25).

1. Revlon is registered as a trademark for: "shampoo and toilet soap" (Reg. No. 647,222); "medicated powder and lotions for the skin, moisturizing hair dressing for men, medicated to fight dandruff" (Reg. No. 700,818); "perfume, cologne, nail enamel, nail conditioner, mascara, eye shadow, lipstick, cosmetic creams and lotions, face makeup and pressed powder" (Reg. No. 1,152,080); "hair care products, namely shampoos, conditioners, treatments, moisturizers, coloring preparations, relaxers, permanents, hairsprays and hair styling preparations" (Reg. No. 1,625,545); "hand held implements, namely tweezers, eyelash curlers, blackhead removers, manicure sticks, nail buffers, nail files, nail shapers, nail smoothers, nail clips, nail nippers, nail scissors, cuticle nippers, cuticle trimmers, toenail clips, toenail nippers, toenail scissors, utility scissors, safety scissors, baby scissors, hand-operated barber shears, thinning shears and hairstyling shears" (Reg. No. 1,660,540).

## B. *Jennifer Leather*

Jennifer Convertibles, Inc. is a regional furniture chain specializing in convertible sofa beds. Defendant Jennifer Leather is a division or spinoff of Jennifer Convertibles [2] that was created to specialize in leather furniture. (Tr. 162). There are approximately nine Jennifer Leather stores in the New York metropolitan area, and the company plans to open more and to expand into other cities. (Tr. 167). The least expensive couch defendant sells retails for $499. (Tr. 190). Jennifer Leather does sell leather couches in a wide variety of colors. (Tr. 186).

## C. *The Challenged Advertisements*

Copies of the advertisements which are the subject of this action are attached to this opinion as Appendix A and Appendix B. Versions of the challenged advertisements have appeared in the New York City subway and in The New York Times and the New York Daily News. The advertisements used in the subway are slightly different from those placed in newspapers.

### 1. *The Subway Version*

The left side of the advertisement features nine leather couches in a variety of colors. The following copy is on the right:

only Revlon has
more colors.

introducing
Jennifer Leather.
our newest stores
devoted exclusively
to leather.

hundreds of
exquisite colors
& shades.
styles.
leathers.
from $499 to $3000.
immediate delivery.

Underneath the copy is defendant's logo and some "fine print" listing the locations and hours of Jennifer Leather stores. Defendant's logo is a stylized box containing the words "Jennifer Leather." "Jennifer" is written in white letters on a black background. "Leather" is written in black letters on a white background. The paragraph beginning "introducing Jennifer Leather" is in red letters.

The line containing the word Revlon is set in Franklin Gothic type and is larger than any other type in the advertisement. The capital "R" in "Revlon" is in Bodoni font and significantly larger than any other letter in the advertisement. This presentation of the word "Revlon" is noticeably different from plaintiff's logo, in which the word "Revlon" is always written in capital letters with a stylized and connected "L" and "O." The advertisement does not indicate that Revlon is a registered trademark.

### 2. *The Newspaper Version*

The version of the advertisement used in newspapers is similar to the one used in the subway but differs in several ways. Most noticeably, the couches are not shown in color. In addition, the advertisements are shaped differently. The subway version is almost square, but the newspaper version is a tall rectangle. Because the newspaper version is narrower, the copy is distributed above and below the photograph, not opposite it. The words "only Revlon has more colors" are above the photograph. Below the photograph are the words:

hundreds of
exquisite colors
& shades.
styles.
leathers.
from $499 to $3000.
immediate delivery.

The copy "introducing Jennifer Leather" is not in the newspaper version. Another difference from the subway version is that the

---

**2.** The precise corporate relationship between Jennifer Convertibles, Inc. and the entities operating under variations of the name Jennifer Leather was never clearly established at trial.

(Tr. 160–165). Nevertheless, Jennifer Convertibles, Inc. agreed to be bound by the judgment in this action. (Tr. 164).

company name "Jennifer Leather" appears at the top of the advertisement, directly above the words "only Revlon has more colors." In addition, at the bottom of the advertisement, below the Jennifer Leather logo, appears the slogan, "The luxury of leather for less."

Rami Abada, the chief operating officer of Jennifer Convertibles, and Steven Cohen, the artist who designed the advertisements, testified that the challenged advertisements were one of a series of five advertisements designed as an advertising campaign. The campaign was intended to convey five messages: (1) that Jennifer Leather offers leather couches at a low price, (2) in a variety of styles, (3) with Italian quality, (4) in a wide variety of colors, and (5) provides rapid delivery. Each of the five advertisements was designed to communicate one of these messages. (Tr. 54, 74–75, 171). According to Abada, the challenged advertisements were intended to highlight the "variety of colors" message of the campaign. (Tr. 172). Although all of the advertisements in the campaign have a similar design, only the challenged advertisements refer to a brand name other than Jennifer Leather. Abada testified that he is generally aware of trademarks but was unaware of all their "ramifications." (Tr. 174). He conceded that Jennifer Leather did not do a trademark search or ask plaintiff's permission before using the name Revlon in the challenged advertisements. (Tr. 173–74).

### 3. *Alleged Harms*

Revlon employees voiced two specific complaints about the challenged advertisements. Grant testified that plaintiff suffers from being associated with defendant because Jennifer Leather's product—leather furniture—is "inconsistent" with the "glitzy" and "glamorous" image Revlon seeks to project. (Tr. 145). Grant contrasted cosmetics, which he described as a "discretionary purchase," with furniture, which he characterized as "a prac-

tical, pragmatic kind of product." Grant testified that any advertisement for a couch, no matter how luxurious or unnecessary, would be inconsistent with cosmetics. (Tr. 146).

Nichols described a more specific harm. He testified that Jennifer Leather's use of the Revlon name "undercuts the objectives of our licensing program and makes it more difficult for us to promote our mark." (Tr. 27). He explained that, "Our marketing theory is that the Revlon name should be associated with products that involve the same type of spontaneous or impulsive purchase decision as cosmetics, and not with products that involve longer term investment type purchasing considerations." (Tr. 27).

### D. *The Kornstein Survey*

Plaintiff presented the testimony of Sandra Kornstein, a professional survey researcher specializing in "surveys for litigation purposes." (Tr. 192). Kornstein was hired to conduct a survey (the "Kornstein Survey") in connection with this action. Her report was received in evidence as Plaintiff's Exhibit 51. (The "report"). According to the report, the goal of the Kornstein Survey was to determine whether consumers were "confused" by the challenged advertisements. The survey attempted to determine whether Jennifer Leather's use of the name Revlon in the challenged advertisements "is likely to lead a significant fraction of consumers to believe that the ownership or management of the two companies are in some way connected and/or that they were joint sponsors of the advertisement." Pl.Ex. 51 at 1.

Interviewers approached mall patrons to gather data for the Kornstein Survey. Kornstein testified that she believed that the "mall-intercept" technique was a reliable way of gathering survey data and that her opinion was based in part on studies published by a professional organization.[3] The survey's defined "universe" of potential interviewees was adults over 18 years of age. (Tr. 251, 284).

---

3. For example, Kornstein testified that she believed that people who agree to be interviewed do not have significantly different opinions from people who do not. "There have been—AAPOR, the organization which I belong to, does a lot of studies to see if people who refuse to submit to surveys are very different from people who agree to and they basically find that there is no difference." (Tr. 252). Kornstein did not explain how one learns the opinion of someone who refuses to be interviewed.

The survey was conducted at three locations: 47 people were interviewed in Massapequa, New York, 45 in Edison, New Jersey, and 60 in Durham, North Carolina. (Tr. 216–17, 222–23).

Once a person agreed to be interviewed, that person was shown two advertisements: the newspaper version of the challenged advertisements and an advertisement for Excedrin. The Excedrin advertisement shows a woman's face above an Excedrin bottle. Next to the woman's face is the statement, "... for headaches I found something better." The following copy appears at the bottom of the advertisement: "What relieves headaches better than Tylenol? Excedrin. That's right, Excedrin. I mean ... Tylenol's OK for headaches, but Excedrin relieves them better. So when I have a headache, I use what works better for headaches." A copy of the Excedrin advertisement is attached to this opinion as Appendix C.

According to Kornstein, the Excedrin advertisement was chosen because, like defendant's advertisement, it contained the names of two "unrelated companies." (Tr. 211). Kornstein testified that the Excedrin advertisement was intended to be a control and was chosen because she considered it not confusing. (Tr. 212, 280). She testified that people who were confused by the Excedrin advertisement would be considered "arbitrarily" confused and classified as "noise." (Tr. 212). Kornstein testified that: "In any survey, a certain amount of people are confused. There are some people that are just always confused." (Tr. 213). The Excedrin advertisement was intended to identify them.

Participants were asked up to four questions after being shown each advertisement and the interviewer recorded their answers. First, all participants were asked, "In your own words, what is the message of this ad?" Second, all participants were asked, "Who do you think this ad is for?" Respondents who gave a "wrong" answer or who said that the

advertisement was for both companies were not asked any more questions. A "wrong" answer was an answer that identified the Jennifer Leather advertisement as an advertisement "for" Revlon or the Excedrin advertisement as an advertisement "for" Tylenol. (Tr. 225).

Participants who gave the "correct" answer to the second question, and people who gave any other type of answer were questioned further.[4] The third question was: "Do you think [Tylenol or Revlon] is in any way associated with [Excedrin or Jennifer Leather]?" Respondents who answered "no" were not questioned further. Respondents who answered "yes," were asked a fourth question: "In what way do you think they are associated." A copy of the questionnaire used by surveyors conducting the Kornstein Survey is attached to this opinion as Appendix D.

Kornstein "coded" responses into four categories. Her report defined the categories as follows:

1a. The respondent (in Question 2) gave the "wrong" company for the advertisement (i.e. Revlon, Tylenol).

1b. The respondent connected the companies in what we understand to be a legally meaningful way. Specifically this category is respondents who associated the companies in Question 3, and then gave "real" connections between the companies in Question 4.

2. The respondent thinks the companies may be connected, but he/she isn't sure or the answer isn't clear. This category includes two subgroups: those who said Don't Know in Question 2, and those who said they were associated but gave unclear answers in Question 4.

3. The respondent does not associate the companies.

Pl.Ex. 51 at 5. Kornstein's report presents her results in the following table:

4. A common "other" type of answer was given when the participant interpreted the word "for" in the second question as referring to the advertisement's intended audience, not the advertiser. Typical "other" responses were "housewives" and "people buying furniture."

| | Category | Ad 1 Jennifer | Ad 2 Excedrin |
|---|---|---|---|
| 1a. | Wrong company for ad | 19% | 3% |
| 1b. | Connects companies | 17% | 9% |
| 2. | Unclear if connects companies | 7% | 7% |
| 3. | Doesn't connect companies | 57% | 81% |

Pl.Ex. 51 at 5. Kornstein interpreted her results as demonstrating that a significantly greater percentage of respondents were confused by the Jennifer Leather advertisement than were confused by the Excedrin advertisement. Kornstein added categories 1a and 1b together, and concluded that 36% (19% + 17%) of respondents were confused by the Jennifer Leather advertisement while only 12% (3% + 9%) were confused by the Excedrin advertisement. Kornstein testified that because the Excedrin advertisement was a control, she subtracted the percentage of people confused by the Excedrin advertisement from the percentage of people confused by the Jennifer Leather advertisement and concluded that at least 24% of the members of the survey's universe were confused by the Jennifer Leather advertisement. (Tr. 233–35). She testified that this "is a statistically significant level of confusion." (Tr. 235). The report does not contain error estimates, but Kornstein testified that the 95% confidence interval around her estimate of confusion is +/− 5%. (Tr. 256).

Defendant's only witness was Yvette R. Schlussel, a sociologist and survey researcher who offered several criticisms of Kornstein's methodology. She testified that Kornstein's universe of potential interviewees—adults older than 18—was too broad. According to Schlussel the universe should have been narrowed to approximate potential purchasers of leather furniture. (Tr. 347). She also criticized the decision to interview only mall shoppers (Tr. 354, 357) and the selection of the three survey locations. (Tr. 353).

Schlussel was particularly critical of surveying customers at a mall in Durham, North Carolina. She noted that the college town's population was not representative of the universe of potential buyers of couches sold by Jennifer Leather. (Tr. 357). She also questioned the propriety of comparing responses of participants who were probably familiar with the regional brand Jennifer Leather (people in the New York metropolitan area) and those who were probably not (people in North Carolina). (Tr. 357–58, 373–74). Another criticism was that Kornstein did not analyze responses on the basis of demographic factors such as gender, age, occupation, place of residence, or race. (Tr. 355). Schlussel also testified that the survey was flawed because it was not properly pretested or validated (Tr. 360), was vulnerable to observation bias (Tr. 360), used leading questions (Tr. 363), and used an improper control (Tr. 369). Finally, Schlussel testified that Kornstein's data analysis was incomplete (Tr. 372) and that her coding was too subjective (Tr. 374).

### Discussion

The complaint contains five counts. Count I claims unfair competition, false designation of origin and false description under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Count II claims dilution under § 368–d of the New York General Business Law. Count III asserts a claim for deceptive acts and practices under § 349 of the New York General Business Law. Count IV asserts a claim for false advertising under § 350 of the New York General Business Law. Count V claims common law unfair competition. Plaintiff has withdrawn Counts III and IV. Only the remaining claims, Counts I, II, and V, are discussed below.

### A. *False Designation of Origin*

Section 43(a) of the Lanham Act prohibits the use of false or misleading descriptions and representations regarding the character or nature of goods or services, including those which are likely to create confusion as to source or sponsorship. 15 U.S.C. § 1125(a)(1)(A).

Although trademark infringement is not the grievance in this case, both parties seem to agree that in any § 43(a) case, the trier of fact must consider and balance the factors discussed in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36,

7 L.Ed.2d 25 (1961) in order to determine the "likelihood of confusion" between the products of the plaintiff and those of the defendant. *See Nikon Inc. v. Ikon Corp.,* 987 F.2d 91, 92 (2d Cir.1993).

The eight *Polaroid* factors are: (1) the strength of the senior mark, (2) the similarity between the marks, (3) the proximity of the products, (4) the likelihood that the senior user will "bridge the gap" between the products, (5) customer sophistication, (6) the quality of defendant's product, (7) evidence of actual confusion, and (8) whether defendant acted in bad faith in adopting the mark. No one factor is determinative; each must be balanced against all of the others to determine the likelihood of confusion. *Nikon,* 987 F.2d at 94.

### (1) *Strength of the Revlon Mark*

Revlon is a strong trademark. It has a long history and is well-known by the general public as a brand of cosmetics and related beauty products. This factor weighs in favor of an injunction.

### (2) *Similarity Between the Marks*

The marks at issue are similar but not identical. Jennifer Leather used the name "Revlon," although it was presented in a type style plaintiff apparently has never used. Nevertheless, this factor weighs in favor of an injunction.

### (3) *Proximity of the Products*

Plaintiff and defendant sell products in completely different markets. Revlon sells cosmetics. Jennifer Leather sells leather furniture. Plaintiff's argument that customers are likely to confuse the parties' products because both advertise a wide variety of colors is unpersuasive. Many products come in a range of colors, and advertising such variety is commonplace. This factor weighs against an injunction.

### (4) *Likelihood of Bridging the Gap*

Trial testimony by Revlon executives suggests that plaintiff is exceedingly unlikely to "bridge the gap" and enter the leather furniture market. Revlon's vice president of mar-

keting research Robert Grant testified that furniture was not "consistent" with the image of "pizzazz and glitz" that the company attempts to project. (Tr. 144–45). Similarly, Revlon's vice president and general counsel Wade Nichols testified that the company would be unwilling to license or otherwise lend its name to promote furniture. According to Nichols, "Our marketing theory is that the Revlon name should be associated with products that involve the same type of purchase decision [as a] cosmetics purchase, and not with products that involve longer term investment type purchasing considerations." (Tr. 27). This factor weighs against an injunction.

### (5) *Sophistication of Consumers*

Customer sophistication should be measured from the point of view of the "ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1137 (2d Cir.1979) (quoting R. Callman, 3 *The Law of Unfair Competition, Trademarks and Monopolies* § 81.2 at 577 (3d ed. 1969)). Neither party presented evidence which bears directly on the sophistication of consumers purchasing either plaintiff's or defendant's products. However, plaintiff presented evidence that the "purchase decision" is very different. (Tr. 27). Plaintiff's witnesses characterized the decision to purchase Revlon products as "discretionary" (Tr. 26, 145), "for personal enhancement" (Tr. 26), and "not necessarily practical." (Tr. 145). In contrast, these witnesses labeled the decision to purchase Jennifer Leather products as a "longer term investment type [purchase]" (Tr. 27), "practical [and] pragmatic." (Tr. 145). Using "purchase decision" as a surrogate for "the attention such purchasers usually give in buying that class of goods," it is clear that customers are not likely to confuse the parties' products. This factor weighs against an injunction.

### (6) *Quality of the Junior User's Product*

Revlon does not contend that defendant's products are of inferior quality. Pl. Post–

Trial Br. at 20. Instead, it relies on the following language in *American Express Co. v. American Express Limousine Service Ltd.*, 772 F.Supp. 729, 735 (E.D.N.Y.1991):

> Plaintiff does not contend that defendants' services are not of a high quality; plaintiff merely contends that it has no ability to control the quality of defendant's services. To this issue, the Second Circuit has noted the potential irony in applying the "quality" factor within a likelihood of confusion analysis; to wit, if the product or service is of an equally high standard of quality this might lead to increased confusion as to its source. [*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986).]

Plaintiff reads too much into this language. Read literally it would create a per se rule that whenever a defendant in a Lanham Act case produces a product of equal quality to the plaintiff's product, there is a greater likelihood of customer confusion. That cannot be what the Second Circuit intended in *Lois Sportswear.* Revlon has failed to produce specific proof that in this instance the quality of defendant's goods is likely to confuse consumers. Without such proof, this factor weighs against an injunction.

### (7) *Actual Confusion*

■ It has become routine in Lanham Act cases to prove confusion by consumer surveys. *See, e.g., Sterling Drug, Inc. v. Bayer, AG,* 14 F.3d 733, 741 (2d Cir.1994) (survey was properly admitted); *McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 38 (2d Cir.1988) (survey admissible despite disputes over methodology); *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 118 (2d Cir.1984) (summary judgment appropriate because improperly conducted survey incapable of demonstrating issue of fact on confusion element of Lanham Act claim). Plaintiff offers the Kornstein Survey as evidence of actual confusion. Defendant raises a number of objections to the admissibility of the Kornstein Survey. It is unnecessary, however, to determine whether the survey was properly admitted because it was so poorly executed that it does not support a finding that customers are actually confused by the Jennifer Leather advertisements. The following methodological flaws undermine confidence in the survey's results.

(a) The Kornstein Survey only tested consumers' reactions to the black and white newspaper version of defendant's advertisement. Kornstein made no attempt to study the subway version of the advertisement which depicted the couches in nine different colors. An unstated assumption of plaintiff's case is that the Kornstein Survey's results are equally valid for both versions of the advertisement. Plaintiff has not established a basis for such an assumption.[5]

(b) Kornstein testified that she employed various controls but neither her report nor her testimony demonstrate that controls were properly used. For example, in order to eliminate "order bias" half of the respondents were first shown the Jennifer Leather advertisement; the other half were first shown the Excedrin advertisement. (Tr. 210–11). Kornstein testified "that is done to prevent order bias and order bias is a belief that the order in which questions or stimuli are presented would somehow affect the results." (Tr. 211). Unfortunately, Kornstein did not provide sufficient information to evaluate whether order bias was present in the survey. Her report does not mention order bias nor does it present data classified by the order in which respondents were shown the two advertisements. Kornstein did testify that "when I looked at the data by order, by which order the respondent saw it in, that did not make a difference." (Tr. 282). Without the data, however, this conclusory testimony cannot be evaluated and is of limited scientific value. There are similar problems with all of the putative controls in the Kornstein Survey.

(c) Kornstein was inconsistent about the proper use of the data collected in North Carolina. She testified that she included the Durham location in her sample because "I

---

**5.** Indeed, a number of respondents noted in their answers that the advertisement was not in color. For example, in response to the question, "In your own words, what is the message of this ad?" respondent 228 said, "Buy a couch. It's a terrible ad, should be in color." Respondent 337 said, "That Revlon has more colors, but this is in black and white."

wanted a mall outside the New York area to see how people who had not been exposed to the advertisement would respond to it." (Tr. 217). She said this was "another type of control." (Tr. 217). However, the North Carolina data is not analyzed as a control in the report; it is included as part of the primary sample. (Tr. 288–89). Using data as both control and primary data is contrary to the purpose of using a control at all. A control is the standard against which experimental data are measured. It is improper to use "control data" as evidence of the effect a survey is attempting to measure. The failure to analyze the North Carolina data rigorously is particularly troubling because Kornstein testified that there were differences between responses given by people in North Carolina and by people in the New York area. (Tr. 234). She did not elaborate or explain why this information was not included in her report.

(d) Kornstein's report does not describe the methods she used to conclude that her results were statistically significant. She testified that "I use a standard, basically a standard deviation." (Tr. 265). She added, "I can show you what the formula looks like. I do not have it memorized. I refer to my statistics books for my formulations." (Tr. 265). This failure to explain methodology makes it impossible to credit, for example, Kornstein's testimony that "slight differences" between men and women's responses were "nothing I would call statistically significant" (Tr. 234)—especially when this information was not included in the report.

(e) Kornstein's testimony did not accurately reflect what she wrote on the questionnaires when she was doing her scoring. She testified that she coded responses into four categories: 1a, 1b, 2 and 3. However, none of the questionnaires is actually marked "1a" or "1b"; there are only questionnaires marked, "1." Thus, it is impossible to reconstruct Kornstein's scoring and assess its accuracy.

(f) An examination of the original questionnaires reveals that Kornstein's coding of the responses was too subjective. For example, respondents # 335 and # 347 both answered "yes" to the question "Do you think Revlon is in any way associated with Jennifer Leather?" They also gave virtually identical answers to the question, "In what way do you think they are associated?" Respondent # 335 answered, "The colors." Respondent # 347 answered, "For colors." Inexplicably, Kornstein classified respondent # 335 as not connecting the companies (category 3) and respondent # 347 as either having gotten the "wrong" message from the advertisement or believing that there was a connection between the parties[6] (either category 1a or 1b).[7]

Questionnaire # 352 is an even more flagrant example of mis-scoring. Respondent # 352 answered "yes" to the question "Do you think Revlon is in any way associated with Jennifer Leather?" In response to the question "In what way do you think they are associated?" respondent # 352 answered, "It's not clear to me." Instead of scoring this response as "unclear" (category 2), Kornstein classified respondent # 352 as either having gotten the "wrong" message from the advertisement or believing that there was some meaningful connection between the parties (category 1a or 1b). Doing so plainly violated Kornstein's own protocol which defined category 2 as including respondents who "think[ ] the companies may be connected, but [who] isn't sure or the answer isn't clear." Pl.Ex. 51 at 5.

In sum, the Kornstein survey is so unreliable that it is entitled to no weight, and as a result, Revlon has failed to prove actual confusion by a preponderance of the credible evidence. This factor weighs against an injunction.

---

**6.** Questionnaire # 347 is marked only with a "1," making it impossible to determine whether Kornstein classified this respondent as giving the wrong answer (category 1a) or merely as connecting the companies (category 1b).

**7.** A comparison of questionnaires # 342 and # 355 provides a similar example. In response to the question "In what way do you think they are associated?" # 342 answered, "the ad indicates that Revlon has more colors" and was scored a "1;" # 355 answered "they have more colors" and was scored a "2."

### (8) *Bad Faith*

The evidence regarding defendant's motivation is equivocal. Jennifer Leather executives were somewhat cavalier. They knew that companies use trademarks (Tr. 174) but they never investigated whether Revlon was a trademark (Tr. 174) and they never requested Revlon's permission to use its name. (Tr. 187). However, this is not necessarily bad faith, even under the definition plaintiff urges this court to adopt: "when a company appropriates an identical mark that is well-known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark, as well as any confusion that might result as to the common origin between that mark and the senior user's product." *Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc.*, 823 F.Supp. 1077, 1087 (S.D.N.Y.1993). Here, defendant's intent seems to have been to convey the message that it offered leather couches in a wide variety of colors. (Tr. 55, 173, 186). That the Jennifer Leather executives chose to compare Jennifer Leather to Revlon seems to turn on the fact that Revlon does, in fact, have a lot of colors and is known to have a lot of colors, not on any particular "goodwill or reputation" of plaintiff's mark. The evidence on this point is sufficiently ambiguous that this factor should be treated as neutral, not weighing for or against an injunction.

### (9) *Weighing the Factors*

█ Of the eight *Polaroid* factors, two favor an injunction, one is neutral, and the remaining five counsel against an injunction. Weighing the factors is more than just counting noses, *see Nikon* 987 F.2d at 96 (factors are "not a rigid formula"), but the fact that the majority of factors weigh against an injunction is significant. More importantly, when viewed as a whole, the evidence does not support a finding that consumers are likely to be misled by defendant's advertisements. The products are totally different, they are sold in different markets, they sell at different prices, plaintiff has been unable to demonstrate actual confusion, and the advertisements make no claim or even imply

that the companies are connected. Based on all of the evidence presented at trial, and after balancing all of the *Polaroid* factors, I find that plaintiff has failed to demonstrate by a preponderance of the credible evidence a "likelihood of confusion" regarding Jennifer Leather's advertisements that say, "only Revlon has more colors."

### B. *Dilution*

█ Plaintiff's real grievance, the use of its name without permission, can in some circumstances constitute a violation of New York's anti-dilution statute. New York General Business Law § 368–d provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

In order to establish a claim under § 368–d, a plaintiff must establish two elements: (1) a distinctive mark capable of being diluted and (2) a likelihood of dilution. *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir.1989); *see Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1165–66 (1977).

█ There is little doubt that plaintiff has established the first element of a § 368–d claim. Distinctiveness under § 368–d is analogous to the strength of a mark for trademark infringement purposes. *Mead Data Central*, 875 F.2d at 1030. As described above, Revlon is an extremely strong mark.

Plaintiff has not, however, established the second element of a § 368–d claim, "likelihood of dilution." Dilution has been defined as "either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Mead Data Central*, 875 F.2d at 1031. Plaintiff argues that even though Jennifer Leather is not a competitor, defendant is liable under this standard for seeking to

coattail on plaintiff's long history of expensive advertising and efforts to build the reputation of the name Revlon. The flaw in plaintiff's argument is that defendant has not sought to appropriate plaintiff's name as its own. While the challenged advertisements refer to a particular characteristic of Revlon products (a wide variety of colors), the advertisements plainly identify Jennifer Leather as the source of the leather couches. In addition, there is no tarnishment of the associations the Revlon mark has come to convey. To the contrary, defendant's advertisements appear to bolster plaintiff's claim that it offers more colors than any other cosmetics manufacturer.

Holding Jennifer Leather liable under § 368–d would not serve the purpose intended by the New York legislature when it enacted the anti-dilution statute:

> Thus an alternative ground of relief is socially desirable to prevent such hypothetical anomalies as Dupont shoes, Buick Aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth. Naturally the owners of established trademarks may be expected to welcome protection of their good names against attempts by infringers, with infinite other words to choose from, to obtain a free ride.

N.Y.Legis.Ann.1954 at 49. If defendant were marketing Revlon couches, the statute might apply. The situation here is different. The advertisements prominently feature the name "Jennifer Leather" and there is no evidence that defendant has attempted to deceive the couch-buying public or has tarnished any positive association of the name Revlon. Therefore, plaintiff has failed to demonstrate a likelihood of dilution under § 368–d of the New York General Business Law.

## C. *Unfair Competition*

Plaintiff asserts claims for unfair competition under the Lanham Act and under the common law. The Lanham Act analysis presented above applies to unfair competition, and therefore, Revlon's statutory claim must be denied. Plaintiff's common law claim also must be denied because the elements of an unfair competition claim under New York law are essentially the same as the elements of false designation of origin under § 43(a) of the Lanham Act. *Kregos v. Associated Press*, 3 F.3d 656, 666 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994). The only significant difference is that establishing a common law claim may require proof of an additional element, bad faith or intent. *Weight Watchers International, Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1283 (S.D.N.Y.1990). Since plaintiff is unable to prove a Lanham Act claim, plaintiff cannot recover under the New York common law.

### *Conclusion*

The foregoing shall constitute my findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52. The clerk is directed to enter judgment against plaintiff and for defendant on the complaint.

SO ORDERED.

APPENDIX A

# only Revlon has more colors.

introducing
Jennifer Leather.
our newest stores
devoted exclusively
to leather.

hundreds of
exquisite colors
& shades.
styles.
leathers.
from $499 to $3000.
immediate delivery.

The luxury of leather for less.

Downtown Manhattan: 693 Broadway (bet.19th & 20th Sts.) (212) 674-1338   Uptown Manhattan: 2300 Broadway (bet. 83rd & 84th Sts.) (212) 721-8773   Brooklyn: 1506 Kings Highway (at East 15th St.) (718) 382-3422
Carle Place: 150 Glen Cove Rd. (1 block north of Old Country Rd.) (516) 739-5351   Farmingdale: 1681 Broadhollow Rd. (Rt. 110, opposite Macy's Furniture Outlet) (516) 249-1436   Selden: 229 Independence Plaza
(next to Blockbuster Video) (516) 736-4427   Yonkers: 2373 Central Park Ave. (near Pier 1 Imports, opp. Seaman's) (914) 779-0214   Paramus: East 255, Route 4 (opposite Cineplex Odeon) (201) 368-2160
Call 1-800-JENNIFER for additional locations.   Open 10-9pm  Sat.10-6pm  Sun.12-5pm   Delivered anywhere in the USA.

1280

## APPENDIX B

APPENDIX C

APPENDIX D

HAND RESPONDENT AD—A

1.  In your own words, what is the message of this ad?

2.  Who do you think this ad is for?
    [DO NOT READ CATEGORIES]
    1 JENNIFER LEATHER—GO TO Q3
    2 REVLON—GO TO Q5
    3 JENNIFER LEATHER AND REVLON—
    GO TO Q5
    4 OTHER—_____—GO TO Q3

IF 1) JENNIFER LEATHER OR 4) OTHER

3.  Do you think Revlon is in any way associated with Jennifer Leather?
    1 YES ASSOCIATED—GO TO Q4
    2 NO, NOT ASSOCIATED—GO TO Q5
    3 DON'T KNOW—GO TO Q5

4.  In what way do you think they are associated?

TAKE BACK AD A—HAND RESPONDENT AD—B

5.  In your own words, what is the message of this ad?

6.  Who do you think this ad is for?
    [DO NOT READ CATEGORIES]
    1 EXCEDRIN—GO TO Q7
    2 TYLENOL—GO TO Q9
    3 EXCEDRIN AND TYLENOL—GO TO Q7
    4 OTHER—_____—GO TO Q9

IF 1) EXCEDRIN OR 4) OTHER

7.  Do you think Tylenol is in any way associated with Excedrin?
    1 YES ASSOCIATED—GO TO Q8
    2 NO, NOT ASSOCIATED—GO TO Q9
    3 DON'T KNOW—GO TO Q9

8.  In what way do you think they are associated?

9.  INTERVIEWER OBSERVATION:   SEX 1 MALE      2 FEMALE