### The TRUSTEES OF COLUMBIA UNIVERSITY in the City of New York, Plaintiff,

v.

### COLUMBIA/HCA HEALTHCARE CORPORATION, Defendant.

No. 96 Civ. 6990 (JGK).

United States District Court, S.D. New York.

April 25, 1997.

J. Christopher Jensen, Richard S. Mandel, Deborah Squiers, Cowen, Liebowitz & Latman, P.C., New York City, for plaintiff.

Joseph A. Calvaruso, Dickerson M. Downing, Morgan & Finnegan, New York City, James R. Higgins, Jr., Amy B. Berge, Middleton & Reutlinger, Louisville, KY, for defendant.

## OPINION AND ORDER

KOELTL, District Judge:

This case concerns a dispute over the right to use the mark "Columbia," alone and in combination with other words or phrases, in connection with the provision of medical and healthcare services. The plaintiff, The Trustees of Columbia University in the City of New York, alleges that the use of the name "Columbia" by the defendant, Columbia/HCA Healthcare Corporation, in connection with the provision of medical and healthcare services is likely to cause confusion, or to cause mistake, or to deceive the public as to the source or sponsorship of the defendant's services and the services of its affiliated physicians and to mislead the public into believing that the defendant's services emanate from, are approved or sponsored by, or are in some way associated or connected with the plaintiff. The plaintiff asserts claims under the Lanham Act, as amended, 15 U.S.C. § 1051 *et seq.*, for false designation of origin, infringement of a registered trademark, and dilution of a famous mark, under New York's anti-dilution statute, and under the common law for trademark infringement and unfair competition. The plaintiff seeks injunctive relief, damages, an accounting for profits, treble damages, prejudgment interest, attorneys' fees, and the costs and disbursements of the action. The plaintiff also asks that the defendant be required to run a program of corrective advertising.

Following an eight-day non-jury trial and after reviewing all of the submissions of the parties and having assessed the credibility of all of the witnesses, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. This Court has jurisdiction over the federal causes of action for alleged violations of the Lanham Act under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a). Jurisdiction over the supplemental state-law claims exists under 28 U.S.C. §§ 1338(b) and 1367(a).

2. The plaintiff is a non-profit corporation organized and existing under the laws of the State of New York, having its principal place of business in the City of New York within this judicial district. (Joint Pre-Trial Order, Undisputed Facts ("UF"), ¶ 4a.)

3. The defendant is a for-profit corporation organized and existing under the laws of the State of Delaware, having its principal place of business in Nashville, Tennessee. The defendant, through numerous subsidiaries, joint ventures and/or partnerships, owns and operates proprietary hospitals and ambulatory health care facilities throughout the United States, which it advertises and promotes in television and print advertising that is broadcast or circulated throughout the United States, including New York. (UF ¶ 4b.)

4. The plaintiff has long been one of the world's leading research and teaching universities that offers post-secondary and post-graduate education in a wide variety of intellectual and professional disciplines, including medicine. (UF ¶ 4c; Morris Witness Statement ("W.S.") ¶ 2.)

5. Originally named Kings College upon its founding in 1754, the college was renamed Columbia College following the American Revolution and was subsequently renamed Columbia University. (UP ¶ 4d.)

6. The plaintiff uses the name "Columbia University" in connection with various educational services. It is the owner of a federal registration for the service mark "Columbia University" in connection with "educational services." (Pl.'s Ex. 1.)

7. The plaintiff has over a period of 200 years established itself as one of the preeminent names in medical education. The Columbia University College of Physicians and Surgeons, known generally as Columbia Medical School (the "Medical School"), as well as the School of Dental and Oral Surgery, the School of Nursing, and the School of Public Health, are regarded as among the most distinguished centers for medical education in the United States. (UP ¶ 4e; Weisfeldt W.S. (Pl.'s Ex. 229) ¶¶ 16–17; Polf W.S. (Pl.'s Ex. 230) ¶ 7.) The Medical School attracts some of the most highly qualified applicants from the United States and abroad, and medical interns and residents from around the world seek out facilities associated with the plaintiff for their training. (Weisfeldt W.S. (Pl.'s Ex. 229) ¶ 16; Morris W.S. (Pl.'s Ex. 226) ¶ 10.)

8. The plaintiff's faculty physicians have garnered widespread public recognition and fame for the quality of their medical skills, research, and leadership in education. A number of them have been awarded Nobel prizes and have been responsible for major medical breakthroughs, including the development of heart catheterization, the development of the first blood test for cancer, the first medical use of a laser, and the first successful transfer of genes from one cell to another. In recent years, the plaintiff has risen to fourth place among all medical institutions in the United States in the amount of federal funding that it has received for biomedical research. (Morris W.S. (Pl.'s Ex.

226) ¶ 9; Weisfeldt W.S. (Pl.'s Ex. 229) ¶ 17; Pl.'s Exs. 7–9, 10b.)

9. As an institution, the plaintiff is not engaged in the practice of medicine and is not licensed to provide medical services. (Morris Trial Test. at 196–98, 389; Polf Trial Test. 535.) The plaintiff permits the members of the faculty of its medical school to engage in the private clinical practice of medicine through its physician practice plans. Patients treated under the practice plans are billed directly by the plaintiff, and all monies paid by these patients are deposited into accounts owned by the plaintiff. After payment of the medical staff salaries, the plaintiff and its medical departments receive approximately five to ten percent of the total income from the practice plans. (Weisfeldt W.S. (Pl.'s Ex. 229) ¶¶ 5, 9; Weisfeldt Trial Test. at 475–80; Pl.'s Exs. 74f, 75.)

10. In 1921, the plaintiff entered into an alliance with The Presbyterian Hospital in the City of New York, a non-profit hospital, to form the world's first academic medical center. The twin goals of the alliance were to secure the best possible medical treatment for the sick and injured, and to provide for medical education and research of the highest order. The medical center uses the name "Columbia–Presbyterian Medical Center." (UF ¶ 4f; Morris W.S. (Pl.'s Ex. 226) ¶ 4; Pl.'s Ex. 19a; Pl.'s Ex. 24 at P4056.)

11. The present day Columbia–Presbyterian Medical Center is comprised of several different hospital centers, doctors' offices, and institutes for the treatment of patients including the Presbyterian Hospital[1] and the plaintiff's various Health Sciences schools, including the Medical School, the School of Nursing, the School of Public Health, and the School of Dental and Oral Surgery. (UF ¶ 4g.)

12. Pursuant to the alliance between the Presbyterian Hospital and the plaintiff, all attending physicians on the staff of the Presbyterian Hospital are nominated by the plaintiff from the faculty of its Medical School. Moreover, the academic department

---

1. As a result of the interlocking relationship over many decades between the plaintiff and the Presbyterian Hospital in connection with the Columbia–Presbyterian Medical Center, the public often refers to the Presbyterian Hospital simply as "Columbia–Presbyterian" or "Columbia–Presbyterian Hospital." (Morris W.S. ¶ 7; Morris Trial Test. at 337; Polf W.S. ¶ 9.)

heads at the plaintiff's Medical School all serve as the chiefs of the Presbyterian Hospital's clinical services. (UF. ¶ 4h; Morris W.S. (Pl.'s Ex. 226) ¶ 6; Morris Trial Test. at 384–85; Pl.'s Ex. 19a.) Notwithstanding their affiliation, the Presbyterian Hospital and the plaintiff are separate entities that maintain separate trustees, officers, and public relations offices. (Morris Trial Test. at 329.) Article One of the operative Alliance Agreement between the plaintiff and the Presbyterian Hospital expressly provides that each institution is to maintain its own independent existence and control. (Pl.'s Ex. 19a; Morris Trial Test. at 329.)

13. Pursuant to the alliance, the plaintiff has orally authorized and licensed the use of the Columbia name to be combined with the name of the Presbyterian Hospital as part of the joint mark "Columbia–Presbyterian Medical Center" that is used by both parties for the services provided by the center. The terms and restrictions of the license are reflected and confirmed in the 1994 Public Relations/Media Guidelines for the Columbia–Presbyterian Medical Center. (Polf W.S. (Pl.'s Ex. 230) ¶¶ 11–12; Morris ¶ 5; Pl.'s Ex. 76.)

14. Pursuant to the alliance, the plaintiff has also orally consented to the use of the "Columbia" name by the Columbia–Presbyterian Medical Center Fund, Inc. ("the Fund"), which owns a federal service mark registration for the "Columbia–Presbyterian Medical Center" mark[2] for "medical care services." (Morris W.S. (Pl.'s Ex. 226) at ¶ 5 & n. 1; Pl.'s Ex. 2.) The Fund has granted the plaintiff and the Presbyterian Hospital an irrevocable license to use the "Columbia–Presbyterian Medical Center" logo. (Def.'s Ex. CU.) There is no agreement between the plaintiff and the Presbyterian Hospital that provides that the Presbyterian Hospital cannot continue to use the Columbia–Presbyterian name if the alliance between the two institutions were discontinued. (Morris Trial Test. at 332.)

15. At present, the plaintiff and the Presbyterian Hospital are separately, or jointly, affiliated with several other hospitals and ambulatory facilities located in New York, New Jersey, and Connecticut. For example, the plaintiff has a University affiliation with Harlem Hospital Center, New York State Psychiatric Institute, and St. Luke's–Roosevelt Hospital Center in New York City; with Helen Hayes (New York State Rehabilitation Hospital) and Mary Imogene Bassett Hospital in upstate New York; and with Overlook Hospital in New Jersey. The plaintiff and the Presbyterian Hospital are jointly affiliated with Horton Hospital, Lawrence Hospital, Nyack Hospital, St. Francis Hospital, and White Plains Hospital Center in New York; The Valley Hospital in New Jersey; and New Milford Hospital in Connecticut. (Morris W.S. (Pl.'s Ex. 226) ¶ 16; Morris Trial Test. at 81–82; Tenenbaum Trial Test. at 559–61; Pl.'s Ex. 22.)

16. In connection with recent merger talks between the Presbyterian Hospital and New York Hospital, which is affiliated with Cornell University's medical school, faculty physicians from the plaintiff and Cornell University have formed an alliance designated "Columbia–Cornell Care." The Columbia–Cornell alliance was formed to help increase marketing and advertising of the services of the affiliated physicians and to negotiate more favorable contracts with HMOs and managed care medical insurers. (Weisfeldt W.S. (Pl.'s Ex. 229) ¶¶ 31–33; Weisfeldt Trial Test. at 442–44, 500–03; Tenenbaum W.S. (Pl.'s Ex. 231) ¶ 22; Pardes W.S. (Pl.'s Ex. 228) ¶ 8.)

17. The Presbyterian Hospital, the Columbia–Presbyterian Medical Center, and the Columbia–Presbyterian Medical Center Fund are not parties in this action.

18. Although the media often shortens the full terms "Columbia–Presbyterian Medical Center," "Columbia–Presbyterian," or "Columbia University," to "Columbia" in the course of reports, those reports almost always contain the other identifying names.[3]

---

2. The plaintiff describes the mark colloquially as a "tennis ball." (Rose Trial Test. at 120.)

3. Even in the recent *New York* Times article entitled "In Columbia Pact, New York City Ties

Pay to Hospital Productivity," the main text of the article refers to Columbia University College of Physicians and Surgeons. (Pl.'s Ex. 211.)

19. The plaintiff publishes and distributes promotional materials aimed at public consumers, primarily under the names "Columbia University," "Columbia–Presbyterian," and "Columbia–Presbyterian Medical Center." [4] (Pl.'s Exs. 24–39, 42–65, 68.) It has sponsored only one print advertisement relating to medical services in *The New York Times* entitled "Columbia University Doctors Are New York's Best." (Pl.'s Ex. 5; Polf Trial Test. at 537–38.) The plaintiff has never advertised any healthcare services on television or radio. The hospitals that are affiliated with the plaintiff and/or the Presbyterian Hospital advertise and promote this affiliation in print and on radio. (Morris W.S. (Pl.'s Ex. 226) ¶ 16; Tenenbaum W.S. (Pl.'s Ex. 231) ¶ 8; Pl.'s Ex. 11c-d.)

20. In early 1996, the plaintiff and the Presbyterian Hospital retained the advertising firm, Bozell Worldwide, to prepare a coordinated advertising campaign to promote the services of the Columbia–Presbyterian Medical Center. Both the plaintiff and the Presbyterian Hospital intend to share the expense of the campaign, which is budgeted at approximately $2 million. (Polf W.S. (Pl.'s Ex. 230) ¶ 18; Rose Trial Test. at 112–14; Weisfeldt Trial Test. at 440–42; Pl.'s Ex. 14.) The major thrust of the campaign is scheduled to begin in 1997 towards the end of the winter. (Polf W.S. (Pl.'s Ex. 230) ¶ 20.)

21. The plaintiff maintains an Internet Web page at "Columbia.edu" with a well-known and highly regarded medical information service under the name "Go Ask Alice." The Columbia–Presbyterian Medical Center similarly maintains a "CPMC" Web site that is linked to the plaintiff's site. (Tenenbaum W.S. (Pl.'s Ex. 231) ¶ 28.)

22. The plaintiff does not own, nor has it attempted to secure, any United States Registration for the mark "Columbia University" or any other variation of the "Columbia" name in connection with medical, hospital, or healthcare services. (Morris Trial Test. at 91.)

23. The word "Columbia" is a term with historic, patriotic, and geographic connotations. An article entitled "Topic of the Times," which appeared in the *New York Times* on October 12, 1996, explained that the word "Columbia" is a term derived from Columbus and is sometimes used as a synonym for America. (Def.'s Ex. MB.) Webster's Ninth New Collegiate Dictionary defines it as "the United States." (Def.'s Ex. EQ.)

24. The defendant is the largest provider of healthcare services in the United States, operating approximately 340 hospitals, 130 surgery centers, and over 200 home healthcare agencies, all of which use some variation of the "Columbia" name. Since its founding in 1987, the defendant has grown to become the ninth largest private employer in the United States with over 285,000 employees. (Scott Dec. ¶ 5, 7.)

25. The defendant's CEO, Richard Scott, who was trained as a lawyer rather than a doctor, initially selected the name "Columbia" because it sounded positive and national in scope, which was consistent with his vision for the company. In selecting the name, Mr. Scott was not aware of any potential conflicts with any entities in the healthcare industry that use the name. Although he had heard of the plaintiff and its law school, he was not aware at that time that the plaintiff had a medical school and was not aware of the Columbia–Presbyterian Medical Center. (Scott W.S. (Def.'s Ex. HG) ¶ 3; Scott Trial Test. at 652, 654.) The defendant has continuously used the word "Columbia" as part of its corporate name since 1987. (UF ¶ 4i.)

26. Defendant is the successor to the Columbia Hospital Corporation, which was first formed in 1987 and owned and operated hospitals or other medical facilities in Texas. Through additional acquisitions, the Columbia Hospital Corporation grew to a base of approximately 12 hospitals located in Texas and Florida by 1991. (UF ¶ 4j.)

27. By 1992, the defendant owned and operated 24 hospitals in Texas and Florida. In September 1993, the defendant merged with Galen Health Care Corporation and in-

---

**4.** Five exhibits refer only to "Columbia" in their titles, but four of those five exhibits indicate on their face that "Columbia University" or "Columbia–Presbyterian Medical Center" is their source. (Pl.'s Exs. 23, 40–41, 66–67.)

creased its size to 115 facilities in 18 states. In February, 1994, the defendant merged with Hospital Corporation of America ("HCA"), which then operated more than 90 hospitals, and the defendant changed its name to the present Columbia/HCA Healthcare Corporation. In April 1995, the defendant merged with Healthtrust, Inc.—The Hospital Corporation, and increased its size to approximately 327 hospitals. (UF ¶ 4k; Scott Trial Test. at 746–49; Pl.'s Exs. 80j-k.)

28. Prior to 1995, the use of the "Columbia" name and logo by the defendant's hospitals was optional. (Scott Trial Test. at 751.) At its Spring 1995 Leadership Conference, the defendant discussed "the process of moving to one identity," including putting the "Columbia" name on all facilities. (Scott Trial Test. at 751; Richardson Trial Test. 1028–29.) The defendant developed and began to use its Diamond <C$ logo with its name. In March 1995, the defendant issued a *Merger Communications* Plan regarding the up-coming merger with Healthtrust, which contained guidelines for the use of its name and Diamond <C$ logo in connection with its services and facilities. (Def.'s Ex. GK.) By August 1995, there were at least 45 facilities that were officially reported to be using "Columbia" as part of their name and in signage on their facilities. (Def.'s Ex. 10; Scott Trial Test. at 831–32.)

29. In August 1995, the defendant conducted a trademark search to make sure that the Diamond <C$ Columbia, without the HCA, did not conflict with any other uses of "Columbia." (Def.'s Ex. 101; Richardson Trial Test. at 986–89, 1011–12.) The defendant then published particular graphics standards for use of the Diamond <C$ Columbia on all its facilities in a uniform way and on November 22, 1995, sent them to all division presidents and facility CEOs. (Def.'s Exs. FB, FJ; Pl.'s Ex. 98.)

30. In early 1996, the defendant distributed Identity Conversion Guides to its facilities to help them develop a more consistent approach in complying with its required policy that the facilities incorporate the Columbia name and Diamond <C$ logo. (Pl.'s Ex. 100; Bowling Trial Test. at 1077–79.) By August 1996, ninety-eight percent of the new signage was up on the defendant's facilities. (Bowling Trial Test. at 1080.)

31. The defendant and its activities have been the subject of extensive media coverage, both local and national, particularly since 1992. (Def.'s Ex. GF, JH–JK, JM–JK; UF ¶ 4q.)

32. In late 1994, the defendant established an information and physician referral service using the telephone number 1–800–Columbia, and acquired exclusive rights to the number by January, 1995. (Richardson Trial Test. at 1000; Pl.'s Ex. 161; UF ¶ 40.) Calls to the number were initially received in the corporate office. (Fetherling Trial Test. at 1206–07.) The number was advertised by local facilities, (Def.'s Ex. KJ; Richardson Trial Test. at 1036) and has been featured on the defendant's Internet Web site since April 1995. (Fetherling Trial Test. at 1206.) It was also featured in the defendant's 1994 Annual Report. (Def.'s Ex. LY.) Due to increasing call volume, calls to the defendant's 1–800–Columbia number are now handled by a computerized centralized call center in Dallas, Texas. (Fetherling Trial Test. at 1207.) Beginning in April 1995, the defendant's 1–800–Columbia number was featured in print advertisements. (Def.'s Ex. KJ.)

33. In January 1995, the defendant began to publish its *Columbia One Source* quarterly magazine. Distribution has risen from 800,000 households to approximately 5 million households. (Scott Trial Test. at 799–800; Richardson Trial Test. at 1027–28; Bowling Trial Test. at 1126.)

34. Beginning in May 1995, the defendant put up its "home page" on the Internet at "Columbia.net." (UF ¶ 41; Def.'s Ex. HC.) It appears under a banner bearing the word Columbia along with the defendant's design and logo style for the Columbia name. Using hypertext links, the defendant's web page is linked to a "Columbia Physicians Corner," which provides transcripts of real time online conversations with "Columbia Physicians" on a variety of medical topics of interest to the general public. There is also a linked web page for "Columbia Physician to Physician," which is intended to be a computer bulletin board where physicians can view or submit

articles written about their particular medical specialty and a "Columbia Physician Links" web page where individual "Columbia Physicians" are allowed to create links to their own individual web sites on which the physicians advertise and promote themselves. (UF ¶ 4n.) Currently, the defendant's Internet site receives about one million hits per month. (Fetherling Trial Test. at 1161.)

35. In August 1995, defendant entered into an agreement with America Online, a major online computer and Internet service provider, to provide a variety of medical information and referral services "online" to America Online customers and other Internet users using the Internet domain name "Columbia.net." Those services became available to the public in October 1995. (UF ¶ 4m; Fetherling W.S. (Def.'s Ex. HJ) ¶ 8.) A similar service has been offered on Compuserve since July 1996. (Fetherling W.S. (Def.'s Ex. HJ) ¶ 9.)

36. In September 1995, the defendant introduced a "Columbia" Visa card, which uses the Diamond <C$ Columbia logo. (Def.'s Ex. FI.)

37. From the inception of the company until approximately 1995, the individual or regional hospitals owned by the defendant were responsible for their own local advertising. (Bowling Trial Test. at 1113–14; Bowling W.S. (Def.'s Ex. HI) ¶ 9; Richardson W.S. (Def.'s Ex. HH) ¶ 6.)

38. Between August 1994 and October 1995, the defendant conducted three national surveys designed to measure the level of awareness of the defendant. (Pl.'s Exs. 92–93.) The report summarizing the three waves of consumer research concluded that "the vast majority (85%) of the United States population was not familiar with or aware of Columbia/HCA Healthcare Corporation." (Pl.'s Ex. 93 at D1427–28 (emphasis in original); Richardson Trial Test. at 975.)

39. In December 1994 and January 1995, the defendant sponsored its first national television advertising. (Def.'s Ex. GG; Richardson W.S. (Def.'s Ex. HH) ¶ 6.) Between May and December 1995, the defendant also ran a series of national full page print ads

featuring the Columbia name and Diamond <C$ logo in USA Today. (Def.'s Exs. FC–FF.)

40. In the fall of 1995, the defendant set in motion the process of selecting an advertising agency to conduct a "brand" campaign. (Richardson Trial Test. at 958.) In contrast to a mark, which consists of a company's name and/or logo, a brand is a set of values, attitudes, and perceptions about the company that are associated with the company's mark. (Adams Trial Test. at 251–52, 291–92; Adams W.S. (Def.'s Ex. HK) ¶ 5.)

41. In January 1996, the Martin Agency began work on the defendant's "brand" campaign. The main goal was to build brand preference, not simply name awareness. (Adams Trial Test. at 248.)

42. *Modern Healthcare's* January 1, 1996 issue predicted that "Columbia will become a name brand in healthcare." (Pl.'s Ex. 174; Richardson Trial Test. 1032–34.)

43. In August 1996, the defendant commenced its nationwide television and print brand advertising campaign. Each print and television ad uses the defendant's distinctive version of Columbia with the Diamond <C$ logo in a particular type style and in a particular color. (UF 4p; Def.'s Ex. GE.)

44. The plaintiff has been aware of the defendant, its history of growth and expansion, and its press coverage for several years. (Rose W.S. (Pl.'s Ex. 227) ¶ 7, 14; Rose Trial Test. at ¶ 129; Morris W.S. (Pl.'s Ex. 226) ¶ 22; Morris Trial Test. at 347–48; Weisfeldt W.S. (Pl.'s Ex. 229) ¶ 34; Weisfeldt Trial Test. 454–55; Tenenbaum W.S. (Pl.'s Ex. 231) ¶ 4; Tenenbaum Trial at 561; Polf W.S. (Pl.'s Ex. 230) ¶ 21; Pardes W.S. (Pl.'s Ex. 228) ¶ 2.)

45. In February, 1993, the plaintiff appointed Richard Scott, the founder of Columbia Hospital Corporation and now the Chief Executive Officer of the defendant, to the plaintiff's Health Sciences Advisory Council. In Mr. Scott's letter of acceptance to the Health Sciences Advisory Council, the letterhead displayed a prominent use of the word Columbia independent of the formal name of the company in the upper left hand corner. In announcing Mr. Scott's appointment in its

1993–1994 brochure, the plaintiff described the defendant as follows: "Columbia was recently identified as the fourth fastest growing company in the United States." Mr. Scott was reappointed to the Health Sciences Advisory Council in 1994 and in 1995. (Def.'s Exs. BH, BJ, BK; UF ¶ 4r.)

46. In September 1995, the plaintiff's School of Nursing gave Mr. Scott its "Second Century Award." (UF ¶ 4r; Def.'s Exs. BL, BM, HE(c).) After the awards ceremony, Mr. Scott met with Dr. Rose, who is Director of the Surgical Service at the Presbyterian Hospital, Chairman of the Department of Surgery at the Columbia University College of Physicians and Surgeons, and Surgeon–in–Chief at the Columbia–Presbyterian Medical Center. (Rose. W.S. ¶ 1; Rose Trial Test. at 134.) Mr. Scott told Dr. Rose that the defendant would like to expand into the New York area if the legal prohibitions against such expansion were removed and that he expected that it eventually would happen. (Rose Trial Test. at 135–36.)

47. Prior to September 13, 1996, the day this action was filed, the plaintiff did not express any objection to the defendant regarding the defendant's use of the word "Columbia." (OF ¶ 4s.)

## CONCLUSIONS OF LAW

1. The plaintiff's first and second claims for relief are for trademark infringement and false designation of origin under Section 32(1) and Section 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a). Section 32(1) provides protection against the "reproduction, counterfeit, copy, or colorable imitation of a registered mark" and its application to "labels, signs, prints, packages, wrappers, receptacles or advertisements" where "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Section 43(a) protects both registered and unregistered marks against the use of any symbol or mark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...." 15 U.S.C. § 1125(a).

2. To succeed on its claims, the plaintiff must, as a preliminary matter, show that it has a valid mark that is entitled to protection. See Estee Lauder Inc. v. Gap, Inc., 108 F.3d 1503, 1508–09 (2d Cir.1997); Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir.1996); Les Ballets Trockadero de Monte Carlo, Inc. v. Trevino, 945 F.Supp. 563, 569 (S.D.N.Y.1996). The plaintiff claims that its use of the mark "Columbia," alone and in combination with other words and phrases, is entitled to protection in the field of medical or healthcare services.

3. The plaintiff is not entitled to a presumption of an exclusive right to use the Columbia mark in connection with medical or healthcare services. According to Section 7(b) of the Lanham Act, a certificate of registration of a trade or service mark issued by the United States Patent and Trademark Office is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate...." 15 U.S.C. § 1057(b). Although the plaintiff has obtained federal service mark protection for the name "Columbia University" for educational services, "the presumption of an exclusive right to use a registered mark extends only to the goods and services noted in a registration certificate." Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 397 (2d Cir.1995); see also McGregor–Doniger Inc. v. Drizzle, Inc., 599 F.2d 1126, 1137 (2d Cir.1979). The plaintiff does not own any federal trademark registrations for Columbia, Columbia–Presbyterian, Columbia University, or any other mark in connection with medical or healthcare services.

4. Where a mark is not registered, the plaintiff has the burden of proving that its mark is a valid trademark. See Reese Publishing Co., Inc. v. Hampton Int'l Communications, Inc., 620 F.2d 7, 11 (2d Cir.1980); GMT Prods., L.P. v. Cablevision of New York City, Inc., 816 F.Supp. 207, 210 (S.D.N.Y.1993). The strength of a trademark in the marketplace and the degree of

protection to which it is entitled are analyzed under four categories of marks that indicate increasing distinctiveness and protectability: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary or fanciful. *See Estee Lauder,* 108 F.3d at 1508–09; *Sports Auth.,* 89 F.3d at 961. Arbitrary or fanciful are sometimes described as separate categories. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). Generic marks are not protectable. Descriptive terms are protectable only with evidence of secondary meaning. Suggestive, arbitrary, and fanciful marks are eligible for protection without proof of secondary meaning. *See Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 212–13 (2d Cir.1985); *Les Ballets Trockadero,* 945 F.Supp. at 569.

■ 5. The mark "Columbia," used alone and in combination with other words and phrases, is arbitrary. It has a dictionary meaning—"the United States"—that bears no relationship to medical or healthcare services. *See Gruner + Jahr USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1075–76 (2d Cir.1993) ("An arbitrary term is one that has a dictionary meaning—though not describing the product—like IVORY for soap."); *Jordache Enters., Inc. v. Levi Strauss & Co.,* 841 F.Supp. 506, 515 (S.D.N.Y.1993) ("Arbitrary marks consist of words that neither suggest nor describe any characteristic of the particular good or service with which it is used."). The mark "Columbia" is therefore eligible for protection without proof of secondary meaning.

6. Once a mark is found to be entitled to protection under the Lanham Act, the central question is whether "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of the defendant's mark," *Gruner,* 991 F.2d at 1077; *see also Estee Lauder,* 108 F.3d at 1510; *Sports Auth.,* 89 F.3d at 960; *Arrow Fastener,* 59 F.3d at 390–91, "or that there may be confusion as to [the] plaintiff's sponsorship or endorsement of the junior mark." *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 502 (2d Cir.1996); *see also Dallas Cowboys Cheerleaders, Inc. v.*

*Pussycat Cinema, Ltd.,* 604 F.2d 200, 204–05 (2d Cir.1979). Proof of actual confusion is not necessary. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1227 (2d Cir.1987); *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.,* 906 F.2d 1202 (7th Cir.1990). However, proof of actual confusion is probative of a likelihood of confusion. *See Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 611 (7th Cir.1965); *David Sherman Corp. v. Heublein, Inc.,* 340 F.2d 377, 380 (8th Cir. 1965).

■ 7. The plaintiff alleges that there is a likelihood of both forward confusion and reverse confusion. Forward confusion is the traditional form of confusion in which the junior user uses the mark to sell goods or services based on the misperception that they originate with the senior user. *See Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 740 (2d Cir.1994); *Sunenblick v. Harrell,* 895 F.Supp. 616, 625 (S.D.N.Y.1995), *aff'd,* 101 F.3d 684 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 386, 136 L.Ed.2d 303 (1996). "Reverse confusion exists when a subsequent user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user." *Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 583 (2d Cir.1991); *see also Sterling Drug,* 14 F.3d at 741 ("Allowing such confusion claims comports with the dual purposes of the Act—namely, to protect the public from confusion as to the source of goods, and at the same time to protect the trademark holder from misappropriation of its mark."); *Sunenblick,* 895 F.Supp. at 625 (describing reverse confusion as "the phenomenon in which the junior user's advertising so greatly overshadows that of the senior user that consumers come to the mistaken conclusion that the junior user is in fact the source of the senior user's goods.").

■ 8. In *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), the Court of Appeals for the Second Circuit set forth eight non-exclusive factors that courts are to consider when determining whether a likelihood of confusion

exists. *See also Estee Lauder,* 108 F.3d at 1510; *Sports Auth.,* 89 F.3d at 960–65; *Hormel Foods,* 73 F.3d at 502–05. In *Polaroid,* the court declared that:

> [T]he prior owner's chance of success is a function of many [v]ariables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities— the court may have to take still other variables into account.

*Polaroid,* 287 F.2d at 495. The decision as to whether a mark infringes requires a "comprehensive analysis of all the relevant facts and circumstances." *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 968 (2d Cir.1981). The Court of Appeals for the Second Circuit has instructed that:

> [T]he *Polaroid* factors are not, of course, "exclusive" and should not be applied "mechanically." No single factor is dispositive, and cases may certainly arise where a factor is irrelevant to the facts at hand. But it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why. The steady application of *Polaroid* is critical to the proper development of trademark law, for it is only when the *Polaroid* factors are applied consistently and clearly over time that the relevant distinctions between different factual configurations can emerge.

*Arrow Fastener,* 59 F.3d at 400 (citations omitted). When the likelihood of confusion is in doubt, the question will be resolved in favor of the senior user. *See Telechron, Inc. v. Telicon Corp.,* 198 F.2d 903, 909 (3rd Cir.1952); *E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.,* 393 F.Supp. 502, 510 (E.D.N.Y.1975); *Lambert Pharmacal Co. v. Bolton Chem. Corp.,* 219 F. 325, 326 (S.D.N.Y.1915) (Hand, J.).

9. First, the Columbia mark, used alone and in combination with other words and phrases, is not a strong mark entitled to a wide scope of protection in the medical or healthcare field. The "strength" of a mark is a measure of " 'its tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source.' " *Sports Auth.,* 89 F.3d at 960–61 (quoting *McGregor–Doniger,* 599 F.2d at 1131) (alteration in original). As discussed above, the plaintiff is not entitled to the presumption of an exclusive right to use its registered mark "Columbia University" for medical or healthcare services because its registration is for "educational services." *See Arrow Fastener,* 59 F.3d at 397; *McGregor–Doniger,* 599 F.2d at 1137. Furthermore, although the plaintiff's Columbia mark, used alone and in combination with other phrases, is arbitrary and therefore "among the strongest and most highly protected class of trademarks," *Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc.,* 832 F.2d 1317, 1321 (2d Cir.1987), it does not signify an exclusive source of medical or healthcare services. The Court of Appeals for the Second Circuit has explained:

> [A]lthough denominating a mark "arbitrary" can be useful in focusing the inquiry, the strength of a mark "depends ultimately on its distinctiveness, or its origin-indicating' quality, in the eyes of the purchasing public." Just as an invented, even bizarre term can lose a measure of trademark protection if it has "become merely descriptive of the product," so too can the distinctiveness of an arbitrary mark be diluted by third party use.

*Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d 251, 256 (2d Cir.1982) (citations omitted) (quoting *McGregor–Doniger Inc.,* 599 F.2d at 1131 and *DuPont Cellophane Co. v. Waxed Prods. Co.,* 85 F.2d 75, 80 (2d Cir.), *cert. denied,* 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936)); *see also Oxford Indus., Inc. v. JBJ Fabrics, Inc.,* No. 84 Civ. 2505, 1988 WL 9959, at *4 (S.D.N.Y. Feb.2, 1988) ("A mark can be conceptually strong (by being arbitrary or fanciful) and at the same time be commercially weak if the mark lacks significance in the market place for identifying the origin of goods."). In this case, third party use and registrations of the name Columbia, including in the healthcare field, have

diluted the strength of the Columbia mark. *See Western Publishing Co., Inc. v. Rose Art Indus., Inc.,* 910 F.2d 57, 61 (2d Cir.1990); *Lever Bros.,* 693 F.2d at 256–57; *Hutchinson v. Essence Communications, Inc.,* 769 F.Supp. 541, 548 (S.D.N.Y.1991). The defendant presented substantial evidence of third party use of the name Columbia in connection with a variety of businesses, including hospitals, healthcare services, and institutions. (Def.'s Exs. A–C, E–F, H–AF, AH–AO, AQ–AT, AV–AX, AZ, BB–BC, BS–BU, BW, CG, EM–EP, HT–IB.) Aside from hospitals associated with or licensed by the plaintiff or the defendant, there are eight hospitals in the United States that incorporate the word "Columbia" in their title including *Columbia–Greene Medical Center, Inc.* in Catskill, New York and Columbia Memorial Hospital in Hudson, New York. (Def.Exs.AJ–AM, BT.) There are at least seven healthcare-related service companies that use the Columbia name including Columbia Medical Plan, an HMO headquartered in Maryland. (Def.'s Exs. A, B, AH, Al, AR–AT, AV, AZ, BC, BU, CG, EM.) Even in the field of education in which the plaintiff has a registered mark, there are eighteen colleges, not associated with the plaintiff or the defendant, that use the name "Columbia," including Columbia College, which has approximately twenty locations nationwide. (Def.'s Exs. M, O–AE, BB, BS.) Moreover, the origin-indicating quality of the plaintiff's mark is further undercut by the fact that, as of August 1995, there were over one hundred federal trademark registrations that incorporated the Columbia name in medical, healthcare, and other fields. (Def.'s Ex. AF.) The plaintiff tries to minimize the significance of these third party uses of "Columbia" by pointing out that some of the hospitals, colleges, and companies are located in cities or counties or on rivers named Columbia and therefore should be disregarded. This argument is not persuasive. There are many third party uses of "Columbia" that do not appear to have a specific geographic basis including Columbia Medical Center in Milwaukee, Wisconsin, and Columbia College of Nursing in Waukesha, Wisconsin. (Def.'s Exs. Q, X, AA, AD, Al, AJ, BU.) Moreover,

whether or not there is a geographic reason for the selection of the Columbia name by these third parties, they are still openly using "Columbia" as a name, thereby detracting from the plaintiff's claimed distinctiveness or exclusivity. As the Vice Dean of the Columbia Faculty of Medicine and Senior Vice President for the Health Sciences Division of Columbia University acknowledged, the plaintiff does not have the exclusive right to use the Columbia mark for healthcare or educational services. (Morris Trial Test. at 92–95.) The weakness of the mark therefore weighs strongly against a finding of likelihood of confusion.

■ 10. Second, the marks used by the plaintiff and the defendant are similar to the extent that they both use the Columbia name, although they become more distinguishable when used in conjunction with other words or phrases and distinctive logos. In considering the degree of similarity between the marks, a court should address "two key questions: (1) whether the similarity between the two marks is likely to cause confusion and (2) what effect the similarity has upon prospective purchasers. In deciding whether the marks are similar as used, [a court does] not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *Sports Auth.,* 89 F.3d at 962 (citation omitted). Here, the plaintiff uses the names "Columbia University," "Columbia University College of Physicians and Surgeons," "Columbia–Presbyterian Medical Center," and "Columbia–Presbyterian," often in conjunction with the tennis ball logo, or other logo, design, or source indicator. (Morris Trial Test. at 337; Weisfeldt W.S. (Pl.'s Ex. 229) ¶ 30; Weisfeldt Trial Test. at 454, 485; Rose Trial Test. at 120; Pl.'s Exs. 24–39, 42–65, 68.) The plaintiff generally does not use the name "Columbia" per se to conduct business or in its advertising except in isolated instances.[5] (Pl.'s Exs. 23, 40–41, 66–67). Although the defendant uses the stylized Diamond <C$ Columbia name and logo, "Columbia/HCA Healthcare Corporation," or "Columbia/HCA," (Pl.'s Exs. 86–89, 100;

---

5. *See supra* note 4.

Adams W.S. (Def.'s Ex. HK) ¶¶ 9 & n. 2, 12; Scott W.S. (Def.'s Ex. HG) ¶ 13; Def.'s Exs. GG), the defendant more recently has focussed on creating a national brand identity under the Diamond <C$ Columbia mark alone, (Def.'s Ex. GE, FJ; Adams W.S. (Def.'s Ex. HK) ¶ 11; Richardson W.S. (Def.'s Ex. HH) ¶ 8). The likelihood of confusion between the plaintiff's and the defendant's marks decreases the more that they are used in conjunction with other words or phrases and distinctive logos as they most frequently are. However, the similarity of the names does weigh ·in favor of finding a likelihood of confusion.

■ 11. Third, the services rendered by the parties are distinguishable. In considering the proximity of the products, a court should "consider whether the two products compete with each other." *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567, 573 (2d Cir.1993). The focus of the product proximity inquiry is "the likelihood that customers may be confused as to the [s]ource of the products, rather than as to the products themselves. . . ." *McGregor-Doniger,* 599 F.2d at 1134; *see also Arrow Fastener,* 59 F.3d at 396. The plaintiff provides educational services through the operation of a number of graduate and under-graduate· schools. One of those schools is a medical school. The plaintiff's affiliation with hospitals such as the Presbyterian Hospital and with the Columbia–Presbyterian Medical Center does not change the nature of the plaintiff's services. Through the affiliation, the plaintiff's students receive medical training at the affiliated hospitals. This does not mean that the plaintiff provides healthcare services. The plaintiff does not have a license to practice medicine. Furthermore, the fact that faculty members of the plaintiff's medical school practice medicine as either individual practitioners or with a non-party hospital and engage in medical research does not mean that the plaintiff is a provider of medical services. The hospital with which the plaintiff is most closely affiliated—the Presbyterian Hospital—is not a party to this lawsuit and is not disputing the defendant's use of the name Columbia in connection with the provision of healthcare services. The plaintiff did not introduce any evidence that suggests that consumers perceive the medical services offered by doctors who are members of the plaintiff's faculty as originating from the plaintiff or that consumers associate any of the faculty practice plans with the plaintiff as opposed to the Presbyterian Hospital. In contrast, the defendant is a licensed provider of medical and healthcare services and is not an educational institution.

■ 12. Fourth, "[b]ridging the gap refers to the senior user's interest in preserving avenues of expansion and entering into related fields.'" *Hormel Foods,* 73 F.3d at 504 (quoting *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985)). This factor involves a determination of the likelihood that the plaintiff will enter the defendant's business or of the average customer's perception that the plaintiff would enter the defendant's market. *See Sports Auth.,* 89 F.3d at 963. The plaintiff's present and future alliances and affiliations with medical and healthcare providers does not change the fact that the plaintiff has not demonstrated a likelihood that it will become a provider of medical or healthcare services.

■ 13. Fifth, the plaintiff has presented little evidence of actual forward or reverse confusion. "For purposes of the Lanham Act, actual confusion means 'consumer confusion that enables a seller to pass off his goods as the goods of another.'" *Sports Auth.,* 89 F.3d at 963 (quoting *W.W.W. Pharmaceutical,* 984 F.2d at 574 (quotation and citation omitted)). No actual consumer confusion need be shown to justify a finding of a likelihood of confusion, although the presence of actual confusion obviously supports such a finding. *See Les Ballets Trockadero,* 945 F.Supp. at 571. To show actual confusion, the plaintiff must demonstrate that the defendant's use "could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Lang,* 949 F.2d at 583. The plaintiff's proffered evidence of actual confusion is de minimis. Several of the plaintiff's doctors testified that a few third parties had told them that they thought that the defendant's advertisements

were connected with the plaintiff. (Weisfeldt W.S. (Pl.'s Ex. 229) ¶¶ 41–43; Weisfeldt Trial Test. at 464–65; Tenenbaum W.S. (Pl.'s Ex. 231) ¶ 6; Tenenbaum Trial Test. at 568–69; Rose Trial Test. at 144, 146; Polf W.S. (Pl.'s Ex. 230) ¶ 23; Polf Trial Test. 540–42.) However, the relevance of this type of evidence is lessened by the small number of people who allegedly expressed confusion and the absence of a valid statistical sample. Moreover, there is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions. Cf. *Gruner + Jahr*, 991 F.2d at 1078 ("It was proper for the trial court to consider [the testimony from the plaintiff's managers and employees as to inquiries about a possible relationship between the plaintiff's and the defendant's publications] not as evidence of actual confusion, but rather as showing only queries into the possible relationship between the parties' publications."). The plaintiff presented no evidence of any patients or doctors who made decisions about which hospital to select based upon confusion between the plaintiff and the defendant. The plaintiff also relies on market research done for the defendant. The plaintiff introduced evidence from the focus group research conducted for St. David's Health Care system in Austin, Texas in the spring of 1996 when it was being acquired by the defendant. (Pl.'s Ex. 171.) The evidence showed that two to three research participants associated the name Columbia with "Columbia University" and "Columbia University Medical School." (Pl.'s Ex. 171 at 4914.) These two to three responses are inadequate to establish that people would confuse the plaintiff's and the defendant's uses of the name "Columbia." The plaintiff also introduced evidence that, in response to an Internet health survey conducted by the defendant in late 1996 to which there were 1700 respondents, four respondents answered yes to the question whether they had ever used a Columbia facility before and identified Columbia–Presbyterian Medical Center, Columbia–Presbyterian Hospital or

Columbia University campus doctor as the facility. (Pl.'s Exs. 166, 210; Fetherling Trial Test. at 1197–1203.) The Internet survey, although evidence of some confusion, is entitled to little if any weight both because of the extremely small numbers involved and because there was no showing that supported the trustworthiness of the survey methodology. *See Jaret Int'l, Inc. v. Promotion in Motion, Inc.*, 826 F.Supp. 69, 73 (E.D.N.Y. 1993); *Hutchinson*, 769 F.Supp. at 557. The plaintiff also relies on evidence from a 1996 Gallup study in which approximately one percent of eight hundred respondents answered that "Presbyterian" was one of the defendant's hospitals. (Pl.'s Ex. 96.) However, only one such response is attributable to a person residing in the Northeast, while four responses are attributable to persons in the South Central portion of the United States where the defendant has two "Presbyterian Hospitals." Moreover, the references to "University Hospital" in the study came only from respondents in the South Central region where the defendant has a "University Hospital." The plaintiff introduced no evidence of any instance in which a patient mistakenly went to one of the defendant's facilities in the erroneous belief that the defendant was associated with the plaintiff or in which a patient mistakenly went to the Columbia–Presbyterian Medical Center in the erroneous belief the plaintiff was associated with the defendant.[6] (Morris Trial Test. at 86–87; Pardes Trial Test. at 397; Rose Trial Test. at 146; Weisfeldt Trial Test. at 466–67; Tenenbaum Trial Test. at 573.) The plaintiff's total failure to introduce any of its own survey evidence also weighs against finding actual confusion. *See Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir.1994), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995); *Essence Communications, Inc. v. Singh Indus., Inc.*, 703 F.Supp. 261, 269 (S.D.N.Y.1988).

14. Sixth, the plaintiff has not established that the defendant acted in bad faith in adopting its mark. Bad faith is shown by demonstrating that the "defendant

---

6. Dr. Tenenbaum did testify that two of his patients in Florida believed that they had been taken to "Columbia University Hospitals" in Florida. However, these patients did not go to the hospitals because they believed that they were affiliated with the plaintiff, but went to them because they were sick. (Tenenbaum Trial Test. at 568–69.)

adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Arrow Fastener*, 59 F.3d at 397 (quoting *Lang*, 949 F.2d at 583 (quotation omitted)). As Judge Learned Hand explained:

"Why it should have chosen a mark that had long been employed by [the plaintiff] and had become known to the trade instead of adopting some other means to identify its goods is hard to see unless there was a deliberate purpose to obtain some advantage from the trade which [the plaintiff] had built up." Indeed, it is generally true that, as soon as we see that a second comer in market has, for no reason that he can assign, plagiarized the "make-up" of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is "likely" to succeed. Then we feel bound to compel him to exercise his ingenuity in quarters further afield.

*American Chicle Co. v. Topps Chewing Gum, Inc.*, 208 F.2d 560, 561–62 (2d Cir.1953) (quoting *Miles Shoes, Inc., v. R.H. Macy & Co.*, 199 F.2d 602, 603 (2d Cir.1952), *cert. denied*, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953)). In this case, there is no evidence to suggest that the defendant acted in bad faith or with the intention of misappropriating any good will built up by the plaintiff in names incorporating the word "Columbia." The defendant's CEO, Richard Scott, testified credibly that he selected the name "Columbia" because it sounded positive and national in scope, which was consistent with his vision for the company. (Scott Trial Test. at 653.) Mr. Scott wanted to imitate other companies that had been successful with "national" or "big" sounding names such as American Medical International, National Medical Enterprises, Republic Health, and Community Health System. (Scott Trial Test. at 653–54.) At the time he chose the name, he was not aware that the plaintiff even had a medical school. (Scott W.S. (Def.'s Ex. HG) ¶ 3; Scott Trial Test. at 652.) Moreover, he was not aware of any potential conflicts with any entities in the healthcare business using the name.

15. Seventh, the quality of the defendant's product does not favor the plaintiff. The analysis of the quality of the defendants' product "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener*, 59 F.3d at 398. Although the plaintiff has presented evidence that its educational programs, faculty, doctors, and students are of the highest quality, it has failed to introduce any concrete evidence that the defendant's hospitals, medical services, doctors, and staff would taint the plaintiff. Indeed, many of the defendant's hospitals have been listed among the outstanding hospitals in the country. (Scott W.S. (Def.'s Ex. HG) ¶ 6; Def.'s Ex. FE; Pl.'s Ex. 85; Scott Trial Test. at 789.) Moreover, there is no evidence that the defendant's use of the Columbia name has caused the plaintiff to lose any revenue or otherwise has made it more difficult for the plaintiff to obtain grants or funding or to attract qualified students, faculty, or physicians. (Morris Trial Test. at 87–88; Pardes Trial Test. at 397; Rose Trial Test. at 147; Weisfeldt Trial Test. at 466; Polf Trial Test. at 545–46; Tenenbaum Trial Test. at 572–73.) Although each party has pointed to adverse publicity about the other, the publicity does not establish that the quality of the medical care provided by any of the institutions involved is of inferior quality. Hence, this factor is essentially neutral in a determination of likelihood of confusion.

16. Eighth, in considering the sophistication of consumers, a court must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods...." *McGregor–Doniger*, 599 F.2d at 1137 (quoting 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 81.2, at 577 (3d ed.1969)); *see also Sports Auth.*, 89 F.3d at 965; *W.W.W. Pharmaceutical*, 984 F.2d at 575. In this case, although members of the general public are the technical purchasers of medical and healthcare services provided by

hospitals, the real purchasers for the purposes of trademark analysis are the doctors who choose the hospitals to which they send their patients. (Adams W.S. (Def.'s Ex. HK) ¶ 11; Scott Trial Test. at 838.) The doctors generally are a very sophisticated group of consumers who use great care in deciding which hospitals with which to affiliate themselves and to which they send their patients. There may also be a second possible group of purchasers made up of patients who choose their doctors based on the doctors' affiliations with certain hospitals, but no evidence of this group was presented at trial.[7]

▬ 17. The Polaroid factors must be weighed as a whole and this process is not a "mechanical process." *Arrow Fastener*, 59 F.3d at 398; *see also Estee Lauder*, 108 F.3d at 1510; *Sports Auth.*, 89 F.3d at 964. In this case, the great majority of the factors point decidedly to a lack of confusion. More specifically, given the weakness of the plaintiff's mark, particularly in view of the widespread use of the name Columbia, the distinctive services rendered by each of the parties, the lack of actual confusion, the good faith over a long period of time shown by the defendant, and the sophistication of the consumers, the balance of the *Polaroid* factors shows that there is little likelihood of confusion. Although the names are certainly similar, it is unlikely that that similarity will cause either forward or reverse confusion between the plaintiff's and the defendant's marks.

▬ 18. The plaintiff's third claim for relief is for federal trademark dilution pursuant to Section 43(c) of the Lanham Act. Section 43(c) entitles the owner of a famous mark "to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark...." 15 U.S.C. § 1125(c). To prevail on a dilution claim, a plaintiff must show (1) ownership of a famous mark; and (2) dilution. *See Clinique Labs., Inc. v. Dep Corp.*, 945 F.Supp.

547, 561 (S.D.N.Y.1996). Factors that are relevant to a determination of whether a mark is distinctive and famous include:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1). The determination whether a mark is famous and distinctive under Section 43(c) is similar to the analysis for strength of the mark for trademark infringement purposes. *Cf. Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir.1989) ("Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes."); *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F.Supp. 1268, 1277 (S.D.N.Y.1994) ("Distinctiveness under [N.Y. General Business Law] § 368–d is analogous to the strength of a mark for trademark infringement purposes."), *aff'd*, 57 F.3d 1062 (2d Cir.1995). Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous

---

7. Patients would tend to be a less sophisticated group of purchasers than their doctors, although they would be likely to exercise a high degree of care before undergoing any costly, medically-

significant procedures. *See Board of Trustees of the University of Arkansas v. Professional Therapy Servs., Inc.*, 873 F.Supp. 1280, 1292 (W.D.Ark. 1995).

mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127; *see also Clinique Labs.*, 945 F.Supp. at 561. Dilution may be shown either through blurring or tarnishment. *See Clinique Labs.*, 945 F.Supp. at 561–63; *see also* H.R.Rep. No. 374, 104th Cong., 1st Sess. 2 (1995), *reprinted in* 1995 U.S.C.C.A.N. 1029, 1029 ("The purpose of [§ 1125(c) ] is to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it, even in the absence of a likelihood of confusion."). Dilution by tarnishment occurs where the defendant uses the plaintiff's mark in association with unwholesome or shoddy goods or services. *See Clinique Labs.*, 945 F.Supp. at 562; *see also Hormel*, 73 F.3d at 507 ("The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use."). Dilution by blurring occurs " 'where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.' " *Hormel*, 73 F.3d at 506 (quoting *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir.1994)).

19. As discussed above, any acquired distinctiveness of the plaintiff's mark in connection with medical or healthcare services has been seriously undermined by third party use of the same or similar marks within New York and across the United States. Even the Vice Dean of the Columbia Faculty of Medicine and Senior Vice President for the Health Sciences Division of Columbia University conceded that the plaintiff does not have the exclusive right to use the Columbia name for healthcare or educational services. (Morris Trial Test. at 92–95.) Moreover, the plaintiff has also failed to demonstrate how the defendant has used the Columbia mark to tarnish, blur, or dilute the plaintiff's service. The plaintiff has introduced no evidence that the defendant's hospitals, medical services, doctors, or staff are unwholesome or shoddy. As explained above, many of the defendant's hospitals have been listed among the outstanding hospitals in the country. The plaintiff has also failed to prove that the Columbia mark is a unique identifier of the plaintiff's service such that the defendant's use of its mark undermines the identifying character of the plaintiff's mark.

20. The plaintiff's fourth claim for relief is for trademark dilution under N.Y. General Business Law § 368–d, which provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. General Business Law § 368–d. Similar to Section 43(c) of the Lanham Act, § 368–d requires that a plaintiff show: (1) ownership of a distinctive mark, and (2) a likelihood of dilution. *See Hormel*, 73 F.3d at 506. As discussed above, the plaintiff has failed to establish either ownership of a distinctive mark or a likelihood of dilution from the defendant's activities.

21. The plaintiff's fifth claim for relief is for common law trademark infringement and unfair competition. To prevail on a claim of common law trademark infringement, a plaintiff must show "that the symbols for which it seeks trademark protection are valid, legally protectable marks and that another's subsequent use of a similar mark is likely to create confusion as to the origin of the product." *Tri–Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 43 (2d Cir.), *cert. denied*, 513 U.S. 987, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994); *see also Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581–82 (2d Cir.1990). The plaintiff's claim for common law trademark infringement fails. As discussed above, although the plaintiff's Columbia mark, used alone and in combination with other words and phrases, is a valid, legally protectable mark, the defendant's use of a similar mark is not likely to create confusion. With regard to the plaintiff's unfair competition claim, under New York law, "the essence of unfair competition . . . is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or

to deceive purchasers as to the origin of the goods.'" *Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236, 249–50 (S.D.N.Y.) (quoting *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.,* 678 F.Supp. 424, 429 (S.D.N.Y.1987), *aff'd,* 923 F.2d 845 (2d Cir. 1990)); *see also Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 35 (1995); *Revlon Consumer Prods.,* 858 F.Supp. at 1278. The plaintiff's unfair competition claim must also fail. As explained above, there is no evidence to suggest that the defendant acted in bad faith or with the intention of misappropriating any good will built up by the plaintiff in names incorporating the word "Columbia."

22. The defendant also argues that the plaintiff's causes of action are barred by estoppel by laches. In order to prevail on a laches defense, a defendant must demonstrate (1) the plaintiff had knowledge of the infringing activities; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant would be prejudiced if the plaintiff belatedly asserted its rights to the mark. *See Tri–Star Pictures,* 17 F.3d at 44; *King v. Innovation Books,* 976 F.2d 824, 832 (2d Cir.1992); *Tap Publications, Inc. v. Chinese Yellow Pages (New York) Inc.,* 925 F.Supp. 212, 223 (S.D.N.Y.1996); *Mussington v. St. Luke's–Roosevelt Hosp. Ctr.,* 824 F.Supp. 427, 433 (S.D.N.Y.1993), *aff'd,* 18 F.3d 1033 (2d Cir.1994). The laches defense has been used to bar both federal trademark claims as well as state statutory and common law claims. *See, e.g., Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1040–41 (2d Cir.1980); *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339, 1355 (E.D.N.Y.1994); *Byron v. Chevrolet Motor Div. of Gen. Motors Corp.,* No. 93 Civ. 1116, 1995 WL 465130, at *6 (S.D.N.Y. Aug. 7, 1995) (listing cases). Furthermore, laches may bar both injunctive and monetary relief. *See Tri–Star Pictures,* 17 F.3d at 44 (barring injunctive relief); *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978), *aff'd,* 607 F.2d 995 (2d Cir. 1979) (barring both injunctive and monetary relief). Judge Weinfeld summarized the defense of estoppel by laches as follows:

Defendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time. Obviously, whether the claim is sufficient to bar relief, depends upon consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties.

*Cuban Cigar Brands,* 457 F.Supp. at 1096 (internal citations omitted); *see also Saratoga Vichy Spring,* 625 F.2d at 1040 (citing this passage with approval). The issue of laches is left to the discretion of the district court. *See Tri–Star Pictures,* 17 F.3d at 44.

23. The plaintiff had knowledge of the defendant's infringing activities for at least three and a half years before it took any action. At the very latest, the plaintiff became aware that the defendant was using the Columbia name in 1993. In February 1993, the plaintiff appointed the defendant's CEO, Mr. Scott, to serve on its Health Sciences Advisory Council. In Mr. Scott's letter of acceptance to the Health Sciences Advisory Council, the word Columbia, independent of the defendant's formal name, was displayed prominently in the upper left hand corner. (Def.'s Ex. BH.) In announcing the appointment of Mr. Scott in its 1993–1994 brochure, the plaintiff stated: "Columbia was recently identified as the fourth fastest growing company in the United States." (Def.'s Ex. BK.) All of the physicians who testified on the plaintiff's behalf admitted that they have been aware of the defendant and its history of growth and expansion for several years. (Rose W.S. (Pl.'s Ex. 227) ¶¶ 7, 14; Rose Trial Test. at 129; Morris W.S. (Pl.'s Ex. 226) ¶ 22; Morris Trial Test. at 347–48; Weisfeldt W.S. (Pl.'s Ex. 229) ¶ 34; Weisfeldt Trial Test. at 454–55; Tenenbaum W.S. (Pl.'s Ex. 231) ¶ 4; Tenenbaum Trial Test. at 561; Polf W.S. (Pl.'s Ex. 230) ¶ 21; Pardes W.S. (Pl.'s Ex. 228) ¶ 2.) Several of these physicians acknowledged that they have been "concerned" or "troubled" by the defendant's use of the Columbia name for several years. (Polf W.S. (Pl.'s Ex. 230) ¶ 22; Polf Trial Test. at 533; Rose W.S. (Pl.'s Ex. 227) ¶ 7;

Rose Trial Test. at 129–30; Tenenbaum W.S. (Pl.'s Ex. 231) ¶ 4; Tenenbaum Trial Test. at 561.) However, the plaintiff did not do anything to stop the alleged infringement until September 1996, when it filed this action.

24. The plaintiff asserts that its delay in taking action is excusable because the defendant's conduct followed a course of progressive encroachment. The plaintiff argues that the defendant's use of the Columbia name changed qualitatively, quantitatively, and precipitously just weeks prior to commencement of this action when the defendant announced the launch of its branding campaign and intention to rename its growing list of hospitals. "While a slow, steady increase in the level of business attributable only to the normal growth of any business may not always be sufficient to excuse a prior delay, any change in the format or method of use of the mark or expansion into new product lines or territories should be sufficient to excuse a prior delay." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31.06[2] [a] (3d ed.1996); *see also Parrot Jungle, Inc. v. Parrot Jungle, Inc.*, 512 F.Supp. 266, 270 (S.D.N.Y.1981) ("A modest encroachment is one thing, a sudden proposed national exploitation of plaintiff's name is quite another, and plaintiff's failure to challenge the former will not entirely disable plaintiffs from preventing the latter."); *Miss Universe, Inc. v. Patricelli*, 271 F.Supp. 104, 110 (D.Conn.), *aff'd*, 386 F.2d 997 (2d Cir.1967) ("But the doctrine of laches is inapposite in this case where the evidence makes plain a history of slow encroachment upon plaintiff's preserve, of increasingly direct competition, and of sudden promotional expansion aimed at exploitation of a market created by plaintiff."). In this case, however, the defendant's use of the Columbia name has been both prominent and national in scope for years. The defendant began using the Columbia name in 1987 when it was first incorporated as Columbia Hospital Corporation. (Scott W.S. (Def.'s Ex. HG) ¶¶ 2, 4; Richardson W.S. (Def.'s Ex. HH) ¶ 4.) The defendant has been the subject of extensive national media coverage for years. (Def.'s Ex. GF.) In December 1994 and January 1995, the defendant began its first national TV advertising campaign. (Def.'s Ex. GG;

Richardson W.S. (Def.'s Ex. HH) ¶ 6.) In January 1995, the defendant first published *Columbia One Source*, a quarterly magazine that provides healthcare information. In late 1994, the defendant began using the telephone number 1–800–Columbia and acquired exclusive rights to the number in January 1995. (Richardson Trial Test. at 1000; Pl.'s Ex. 161; UF ¶ 40.) In May 1995, the defendant began to promote its healthcare activities on its Internet Web site. (UF ¶ 41; Def.'s Ex. HC.) In October 1995, the defendant launched Columbia Physician Chats on America Online. (Fetherling W.s. ¶ 8.) The defendant launched a similar Columbia Physician Chat on Compuserve in July 1996. (Fetherling W.S. (Def.'s Ex. Hi) ¶ 9.) Although prior to 1995, the use of the "Columbia" name and logo by the defendant's hospitals was optional, (Scott Trial Test. at 751), the first hospitals to use the Columbia name began to do so in July 1993, (Scott Trial Test. at 758.) By August 1995, at least forty-five of the defendant's facilities were officially reported to be using "Columbia" as part of their name and in signage on their facilities. (Def.'s Ex. 10; Scott Trial Test. at 831–832.) In early 1996, the defendant distributed Identity Conversion Guides to its facilities to help them develop a more consistent approach in complying with its required policy that the facilities incorporate the Columbia name and Diamond <C$ logo. (Pl.'s Ex. 100; Bowling Trial Test. at 1077–79.) The defendant's recent brand campaign was different from the defendant's prior advertising in the sense that it was a centralized effort coordinated by the corporate office. (Adams W.S. (Def.'s Ex. HK) ¶ 6.) But it did not significantly change the total amount of money spent on advertising by the defendant. (Bowling W.S. (Def.'s Ex. HI) ¶ 12; Adams W.S. (Def.'s Ex. HK) ¶ 6.) The recent brand campaign also does not change the fact that the defendant has been a prominent national company that has used the Columbia name for years and that the plaintiff has inexcusably delayed asserting its rights in the mark despite its knowledge of the use of that mark for years. *See, e.g., New Era Publications Int'l v. Henry Holt & Co., Inc.*, 873 F.2d 576, 584–85 (2d Cir.1989), *cert. denied*, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990)

(finding that laches barred injunctive relief where the plaintiff failed to take any steps to enjoin infringing publication for two years and finding that the delay was "unconscionable"); *Byron*, 1995 WL 465130, at *6–*7 (finding unreasonable delay where the plaintiff sent two cease-and-desist letters and then did not bring suit for seven years); *McDonald's Corp. v. Druck & Gerner, D.D.S., P.C.*, 814 F.Supp. 1127, 1137 (N.D.N.Y.1993) (finding that the plaintiff inexcusably delayed in asserting trademark rights when it did not send protest letter until two years after it received notice of infringement).

25. The defendant has also demonstrated that the plaintiff's delay in asserting its rights prejudiced it. "Specifically, prejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.'" *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir.1996). From the beginning of 1993 until September 1996, the plaintiff was aware of the defendant but did not express any objection to the defendant regarding its use of the "Columbia" name. During this period, the defendant spent millions of dollars developing programs that prominently feature the Columbia name including its Internet site, the 1–800–Columbia telephone number, *Columbia One Source*, and the Columbia Visa card, advertising and promoting its facilities, changing the names of its hospitals, and developing its new unified design and brand campaign. (Scott Trial Test. at 810–15.) By waiting over three and a half years to assert its present claims, the plaintiff precluded the possibility that the defendant could effectively adopt an alternative marketing position.[8] *See Conopco*, 95 F.3d at 192–93 (finding that the district court properly found that Campbell had been prejudiced by the delay where Campbell had committed massive resources to exploit a marketing strategy that it had chosen six years before) Accordingly, the plaintiff's claims are also barred by estoppel by laches.[9]

26. The defendant's claim for attorneys' fees is denied. Section 35 of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). In order to find that a case is "exceptional" under this provision, there must be a showing of bad faith. *See Conopco*, 95 F.3d at 194–95; *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996); *Tap Publications*, 925 F.Supp. at 224. Although the plaintiff has failed to prevail, it cannot be said that this action—albeit belated—was brought in bad faith. Because the defendant has failed to prove that the plaintiff acted in bad faith, the defendant's claim for attorney's fees is denied.

## CONCLUSION

For the reasons explained above, all of the plaintiff's claims are **dismissed**, and the defendant's claim for attorneys fees is **denied**. The Clerk is directed to enter judgment dismissing this action and closing the case.

SO ORDERED.

---

8. The plaintiff argues that even if laches were proven, it would still be entitled to injunctive relief as to those regions and markets the defendant has not penetrated as of the commencement of this action, such as the New York area. See *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 152–53 (5th Cir.1985). However, there is no reasonable way to limit the defendant's use of the Columbia name in the greater New York area market without an effect on the national advertising market. (Scott Trial Test. at 858–59; Adams Trial Test. at 303–09; Richardson Trial Test. at 1034–35; Bowling Trial Test. at 1100.) In any event, the plaintiff has failed to prove the necessary elements to entitle it to any injunctive relief, even in the New York area.

9. Because the plaintiff's causes of action are barred by estoppel by laches, it is unnecessary to reach the defendant's argument the plaintiff's claims are barred by estoppel by acquiescence.